# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

KATINA B. HEBERT                                             CIVIL ACTION

VERSUS                                                      17-641-SDD-RLB

ASCENSION PARISH
SCHOOL BOARD

## RULING

This matter is before the Court on the *Motion for Partial Summary Judgment*[1] by Plaintiff, Katina B. Hebert ("Plaintiff").  Defendant, Ascension Parish School Board ("Defendant") has filed an *Opposition*[2] to this motion.  Also before the Court is the *Motion for Summary Judgment*[3] filed by Defendant, to which Plaintiff filed an *Opposition*.[4]  For the following reasons, the Court finds that both Plaintiff's and Defendant's motions should be denied.

## I.    FACTUAL BACKGROUND

Plaintiff brings this action against her former employer, Defendant, Ascension Parish School Board, seeking relief under the Americans with Disabilities Act, as amended 42 U.S.C. § 12101 *et seq*.[5] Plaintiff alleges that she began working for Defendant in August of 1999 as a first and second grade teacher at St. Amant Primary School.  Plaintiff claims that she was involuntarily transferred to Sorrento Primary School

---

[1] Rec. Doc. No. 72.
[2] Rec. Doc. No. 96.
[3] Rec.Doc. No. 76.
[4] Rec. Doc. No. 108.
[5] Rec. Doc. Nos. 1 and 32.
Document Number: 52739

in May of 2011 and assigned to teach second and fifth grades.[6]  Plaintiff alleges that she

"suffers from rhinitis, asthma, psoriasis, bronchospasm, dermatitis, and migraine

headaches due to a longstanding history of exposure to strong odors, chemicals

contained in industrial pollutants, certain cleaning products, perfumes, and other

allergens.[7]  Plaintiff also claims that she informed Defendant of her disability and resulting

limitations, and she made at least five requests for accommodations between September

21, 2011 and June 1, 2015, prior to her termination.[8]  Plaintiff contends Defendant fired

her on July 10, 2015 to avoid having to "provide reasonable accommodations to assist

Ms. Hebert in performing her job."[9]  Plaintiff moves for partial summary judgment on the

sole issue of whether she is disabled under the ADA.

Defendant moves for summary judgment on all claims asserted by Plaintiff.

Defendant contends Plaintiff is not disabled under the ADA, and she was not qualified for

the job as it "based its decision to terminate plaintiff's employment as a teacher solely on

objective performance data demonstrating consistent and objectively poor classroom

performance, substandard/failing test scores, and inability to exhibit improvement in

teaching performance despite implementation of enhancement plans."[10]  Further,

although Defendant disputes that Plaintiff was entitled to protection under the ADA, it

contends that it provided Plaintiff with reasonable accommodations when requested,

although it acknowledges Plaintiff's transfer requests were not granted.   Finally,

Defendant contends Plaintiff's retaliation claim fails as there is no evidence to dispute that

---

[6] Rec. Doc. No. 32, ¶6.
[7] *Id.* at ¶8.
[8] *Id.* at ¶s 9, 11.
[9] *Id.* at ¶16.
[10] Rec. Doc. No. 14, p. 2.
Document Number: 52739

Plaintiff's principal contacted Defendant in May 2015 to advise that Plaintiff was ineffective and to recommend her termination, which is prior to Plaintiff's email dated June 24, 2015, appealing the denial of her transfer request and the filing of an EEOC complaint. Thus, according to Defendant, it could not have retaliated against Plaintiff for taking protected activity that occurred after the decision to terminate Plaintiff was already initiated.

## II.    PREVIOUS EVIDENTIARY RULINGS

The Court made the following evidentiary rulings which narrow the evidence available for the Court's consideration of the Parties' summary judgment motions.

The Court granted Defendant's *Motion in Limine to Strike Plaintiff's Education Expert Michael Deshotels and His Report*, finding that the testimony of Plaintiff's purported education expert, offered to give opinions on the performance evaluations for teachers under state mandated procedures as compared to Plaintiff, was irrelevant and unhelpful to the trier of fact.[11]   The Court noted that, "[w]hile the VAM performance evaluation method might be subject to criticism, it is undisputed that the APSB was required to use the State's legislatively enacted teacher performance evaluation and criteria," and any "opinion testimony critical of state mandated performance evaluation poses an unacceptable risk of juror confusion and is irrelevant."[12]

The Court also granted Defendant's *Motion in Limine to Strike Dr. Warshowsky*, Plaintiff's purported treating physician to be utilized under Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure.[13]   The Court excluded Dr. Warshowsky for several reasons,

---

[11] Rec. Doc. No. 114.
[12] *Id.* at 4-5.
[13] Rec. Doc. No. 116.
Document Number: 52739

including the finding that he:  (1) lacked the education, training, and experience to provide opinion testimony regarding toxicity and exposure and alleged related disabilities based on his practice as an OB/GYN; (2) admitted in his deposition that the review and analysis of toxicological information, distances, and exposure levels was information not typically addressed by physicians in his field of expertise; (3) had no knowledge of the proximity of the schools at issue in this case to any sources or possible sources of emission or air pollutants; (4) had no factual information by which to determine if Plaintiff had been exposed to environmental toxins; (5) admitted that he lacked expertise in toxicology, environmental sciences, allergies, immunology, neuroscience, or dermatology; (6) lacked any reliable clinical basis to opine as to the etiology of Plaintiff's symptoms/complaints or the nature, extent, and/or cause of any alleged disability;  and (7) examined the Plaintiff only once before she knew she would be terminated by Defendant and only twice after her termination.[14]

The Court denied Plaintiff's *Motion in Limine to Exclude the Expert Report and Testimony of Brian R. Beaubout*, finding that Dr. Brian R. Beaubout's ("Dr. Beaubout") proffered opinions "are grounded in his working knowledge and familiarity with Louisiana's teacher evaluation and performance requirements," and his conclusions are "supported by the evidence and documents" upon which he relied.[15]

Plaintiff's *Motion in Limine to Exclude the Expert Report and Testimony of Ervin Ritter* was granted in part and denied in part.  The Court found that Ervin Ritter ("Ritter"), a licensed professional engineer, is qualified to give opinion testimony about the air

---

[14] *Id.* at 2-3.
[15] Rec. Doc. No. 115 at 3.
Document Number: 52739

quality in the vicinity of the Sorrento and Prairieville primary schools based on his review of regulatory records and air sampling collected and analyzed.[16] However, the Court excluded any opinions offered by Ritter relating to medical causation, finding that Ritter is not qualified to testify as to medical causation.[17]

Finally, the Court denied Plaintiff's *Motion in Limine to Exclude Testimony and Evidence Regarding the Plaintiff's Job Performance*, finding that the Defendant, should Plaintiff meet her *prima facie* burden, is required to meet its burden of demonstrating a legitimate, nondiscriminatory reason for her termination via evidence of Plaintiff's alleged poor job performance, and documentation of this defense was disclosed in discovery.[18] The Court did, however, rule that Defendant may not introduce evidence of comparative teacher performances.[19]

Further, the Court notes that Plaintiff identified the following alleged disabilities and/or illnesses in her *Amended Complaint*: rhinitis, asthma, psoriasis, bronchospasm, dermatitis, migraine headaches, and debilitating allergies.[20] However, in Plaintiff's *Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment*, she identifies the following additional maladies by which she purportedly claims disabled status under the ADA: "hormonal imbalance, uterine fibroid tumors, adrenal fatigue, leaky gut syndrome, and genetic mutations that 'decrease her body's ability to process toxins and harmful chemicals.'"[21] As these conditions were not identified in Plaintiff's *Amended*

---

[16] Rec. Doc. No. 117 at 2.
[17] *Id.*
[18] Rec. Doc. No. 118.
[19] *Id.* at 3.
[20] Rec. Doc. No. 32, ¶ 8.
[21] Rec. Doc. No. 72-1 at 2 (citations omitted).
Document Number: 52739

*Complaint*, they are not properly before the Court on summary judgment and will not be considered for purposes of determining if Plaintiff has established that she is "disabled" for purposes of the ADA.

## III.  LAW & ANALYSIS

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[22]  "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[23]  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[24]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[25]  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[26]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a

---

[22] Fed. R. Civ. P. 56(a).

[23] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

[24] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. at 2552)).

[25] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

[26] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

Document Number: 52739

reasonable jury could return a verdict for the nonmoving party.'"[27]  All reasonable factual inferences are drawn in favor of the nonmoving party.[28]  However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[29]  "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint."'"[30]

### B. Discrimination under the ADA

In a discriminatory-termination action under the ADA, the employee may either present direct evidence that she was discriminated against because of her disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, a Title VII case."[31]  The analysis first requires the plaintiff to establish a *prima facie* case of discrimination.[32]  To prove a *prima facie* case for a violation of the ADA, a plaintiff must show that (1) she is disabled or regarded as disabled within the meaning of the ADA, (2) she is qualified for the job position, and (3) she was subjected to an adverse employment action on account of her disability or perceived disability.[33]  Accordingly, a "defendant may satisfy its burden on summary judgment by showing that

---

[27] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[28] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[29] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[30] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).
[31] *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (internal citation omitted).
[32] *Id.*
[33] *Id.* at 697.  *See also*, *Suggs v. Central Oil of Baton Rouge, LLC*, 2014 WL 3037213, at *5 (M.D.La. July 3, 2014).

Document Number: 52739

plaintiff has failed to establish a prima facie case of discrimination."[34]   However, if the plaintiff is able to make a *prima facie* showing, then the burden shifts to the defendant-employer to articulate and support with record evidence, a legitimate, non-discriminatory reason for the adverse employment action.[35]   If the employer comes forward with evidence of a non-discriminatory reason for the employment action, then the burden shifts to the plaintiff to produce record evidence from which a reasonable jury could find that the articulated reason was merely pretext for the unlawful discrimination.[36]

      1.    <u>Disabled</u>

The Parties dispute whether Plaintiff was disabled under the ADA.  The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual."[37]  In addition, there must be "a record of such an impairment," or the individual must be "regarded as having such an impairment."[38] The determination of disability is a three-part test: (1) impairment, (2) major life activity, and (3) whether the impairment substantially limits at least one major life activity.[39]  "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.  An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially

---

[34] *Butler v. State, Louisiana Dept. of Public Safety and Corrections*, 2014 WL 6959940, at *8 (M.D.La. Dec. 4, 2014).

[35] *Bell v. Lane*, 2014 WL 4925682, at *6 (M.D.La. Sept. 30, 2014)(citing *McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 279-80 (5th Cir. 2000)(citing *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

[36] *Id.*

[37] 42 U.S.C. § 12102(1).

[38] *Id.*

[39] *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 654 (5th Cir. 2003).

Document Number: 52739

limiting."[40] "Major life activities include 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.'"[41]

In 2008, Congress passed the ADA Amendments Act ("ADAAA") to "make it easier for people with disabilities to obtain protection under the ADA."[42] "A principal way in which Congress accomplished that goal was to broaden the definition of disability."[43] Specifically, Congress noted that "the Supreme Court and EEOC had interpreted the 'substantially limits' standard to be a more demanding one than Congress had intended."[44]

Defendant routinely relies on pre-amendment law in support of its motion, particularly referencing *Sutton v. United Air Lines, Inc.*[45] and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams.*[46] However, as the district court for the Western District of Louisiana explained in *Johnson v. JPMorgan Chase & Co.*:[47]

The stated purposes behind the ADAAA included, *inter alia*,

(4) to reject the standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), that the terms "substantially" and "major" in the definition of disability under the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled and that to be substantially limited in performing a major life activity under the ADA

---

[40] *Willis v. Noble Environmental Power LLC.*, 143 F.Supp.3d 475, 481 (N.D. Tex. 2015)(quoting 29 C.F.R. § 1630.2(j)(1)(ii)).
[41] *Kemp v. Holder*, 610 F.3d 231, 235 (5th Cir. 2010) (quoting 42 U.S.C. § 12102(2)(A)).
[42] 29 C.F.R. § 1630.1(c)(4).
[43] *Cannon v. Jacobs Field Services North America, Inc.*, 813 F.3d 586, 590 (5th Cir. 2016).
[44] *Id.*; 42 U.S.C. § 12101 note (ADA Amendments Act of 2008) (expressly disapproving of prior Supreme Court decisions and EEOC interpretations of the "substantially limits" standard); *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013) (stating that the ADAAA was passed to correct the perceived misconception that the "substantially limits" standard is a demanding inquiry).
[45] 527 U.S. 471 (1999).
[46] 534 U.S. 184 (2002).
[47] No. 16-1632, 2017 WL 1237979 at *4-5 (W.D. La. Feb. 16, 2017).
Document Number: 52739

"an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives;"

(5) to convey congressional intent that the standard created by the Supreme Court in the case of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) for "substantially limits", and applied by lower courts in numerous decisions, has created an inappropriately high level of limitation necessary to obtain coverage under the ADA, to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis; and

(6) to express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines the term "substantially limits" as "significantly restricted" to be consistent with this Act, including the amendments made by this Act.[48]

Thus, in accordance with Congressional instructions, the EEOC regulations were amended in April 2012 to provide, in pertinent part, as follows:

(j) Substantially limits—

(1) Rules of construction. The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity:

(i)     The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

(ii)    An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment

---

[48] *Id.* (quoting ADAAA, PL 110-325 (emphasis in original)).
Document Number: 52739

will constitute a disability within the meaning of this section.

(iii)   The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity **should not demand extensive analysis**.

(iv)    The determination of whether an impairment substantially limits a major life activity **requires an individualized assessment.** However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is **lower than the standard for "substantially limits" applied prior to the ADAAA**.

(v)     The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

(vi)    The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

(vii)   An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(viii)  An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment.

* * *

(4) Condition, manner, or duration—

(i)     At all times taking into account the principles in paragraphs (j)(1)(i) through (ix) of this section, in determining whether an individual is

substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity.

(ii)     Consideration of facts such as condition, manner, or duration may include, among other things, consideration of the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of a major bodily function. In addition, the non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.

(iii)    In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of disability, the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population.

(iv)    Given the rules of construction set forth in paragraphs (j)(1)(i) through (ix) of this section, it may often be unnecessary to conduct an analysis involving most or all of these types of facts. This is particularly true with respect to impairments such as those described in paragraph (j)(3)(iii) of this section, which by their inherent nature should be easily found to impose a substantial limitation on a major life activity, and for which the individualized assessment should be particularly simple and straightforward.[49]

---

[49] 29 C.F.R. § 1630.2(j)(1), (2), & (4) (emphasis added).
Document Number: 52739

The most recent Fifth Circuit decision interpreting "substantially limits" is in *Williams v. Tarrant County College District.*[50] In *Williams*, the plaintiff claimed to suffer from depression, PTSD, ADHD, and other conditions which were accompanied by symptoms including "debilitating migraine headaches" which she claimed, when unmanaged, "made it difficult for her 'to think well, concentrate, take care of [her]self, [and] sleep normally.'"[51] The plaintiff's employer moved for summary judgment on her ADA claim, and the district court granted summary judgment in favor of the employer, finding that the plaintiff's "self-serving declaration, without medical documentation or support, [was] not sufficient" to overcome the employer's motion.[52] The district court had "disregarded [plaintiff's] declaration as conclusory, and second, ruled her 'declaration … even if accepted in whole … [to be] insufficient summary judgment evidence to raise a material fact issue as to a substantial limitation' without corroborating medical evidence."[53]

In reviewing the district court's decision, the Fifth Circuit noted that,

"Congress amended the ADA in 2008 to clarify its scope and remedy some unintended judicial interpretations. In Congress' view, the Supreme Court, in cases like *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), 'narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect.'"[54]

Applying these broader definitions, the Fifth Circuit noted the plaintiff's burden of

---

[50] 717 Fed. Appx. 440 (5th Cir. 2018).

[51] *Id.* at 447.

[52] *Id.* at 448.

[53] *Id.* at 447.

[54] *Id.* at 446 (quoting ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(a)(4)–(5) (2008) (Findings and Purposes) (codified in scattered sections of 42 U.S.C.)).

Document Number: 52739

demonstrating that she suffers from a disability under the ADA and explained that she satisfies this burden as follows:

> A plaintiff satisfies the actual standard by showing she has "a physical or mental impairment that substantially limits one or more major life activities". *Id.* § 12102(1)(A). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, [and] walking". *Id.* § 12102(2)(A). The EEOC has cautioned: "'Substantially limits' is not meant to be a demanding standard". 29 C.F.R. § 1630.2(j)(1)(i). "An impairment need not prevent, or significantly or severely restrict" performance of major life activities, but rather, the standard is whether it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population". *Id.* § 1630.2(j)(1)(ii). **This comparison "usually will not require scientific, medical, or statistical analysis**". *Id.* § 1630.2(j)(1)(v).[55]

In reversing the district court, the Fifth Circuit first noted its disagreement with the district court's finding that the plaintiff's declaration was conclusory:

> As an initial matter, Williams' declaration is not conclusory: it details her diagnoses, treatments, and symptoms since childhood, and elaborates on some of the recent effects of her ailments. For example, she explained that, after the 2012 assault, "the symptoms of [her] depression, PTSD Complex, ADHD, and other conditions were constantly with [her]", and she "had trouble forming thoughts and communicating". And, when unmanaged, her various conditions gave her "debilitating migraine headaches" and made it difficult for her "to think well, concentrate, take care of [her]self, [and] sleep normally". The substantial limitation of exactly these types of activities constitutes a disability under the ADA. *Id.* § 12102(2)(A) (caring for oneself, sleeping, concentrating, thinking, and communicating enumerated major life activities). Additionally, two of the conditions Williams chronicles in her declaration—major depressive disorder and PTSD—are included in the implementing regulations' list of impairments that should "easily be concluded" to substantially limit brain function. 29 C.F.R. § 1630.2(j)(3)(iii). The court, therefore, should have considered Williams' declaration as relevant summary-judgment evidence of substantial limitation.

> Not only is it relevant, **it is sufficient to create the requisite genuine dispute of material fact.** The court's conclusion that Williams' "self-serving declaration, without medical documentation or support, is not sufficient" is incorrect. The 2008 amendments and their implementing regulations

---

[55] *Id.* at 446-47 (emphasis added).
Document Number: 52739

broaden protection for the disabled, in part by clarifying, as noted *supra*, that showing substantial limitation "usually will not require scientific, medical, or statistical analysis". *Id.* § 1630.2(j)(1)(v). The court's requiring medical corroboration at the summary-judgment stage was, therefore, erroneous.[56]

The court also disagreed with the lower court's finding that the plaintiff's ability to perform her job duties despite her medical conditions undermined her claim:

The court also erred in suggesting Williams' being certified to "work a full, regularly scheduled day with no restrictions" undercut her disability claim. An individual's ability to perform her job does not prevent a finding of disability; her disability may be unrelated to the performance of her job, or perhaps, with reasonable accommodations, she is capable of fulfilling her duties. The court's statement was therefore contrary to both law and experience. *E.g., Cannon*, 813 F.3d at 591 n.3 (plaintiff's statements that he needed no accommodation at work do not undermine evidence of actual disability). Similarly, the implication Williams could not show disability without showing she is "a person who has difficulty leading a normal life" finds no support in the ADA, its implementing regulations, or our caselaw.[57]

The *Williams* court continued by noting that "district courts within this circuit routinely consider a plaintiff's testimony, without more, sufficient to create a genuine dispute of material fact regarding substantial limitation."[58]  Thus, the court found that:

Williams' detailing in her declaration her trouble sleeping, thinking, focusing, communicating, and caring for herself is no different. In the light of the relatively low bar created by the substantially-limits and summary-judgment

---

[56] *Id.* at 447-48 (emphasis added).
[57] *Id.* at 448.
[58] *Id.* (citing *e.g., Kennedy v. Parkview Baptist Sch., Inc.*, 2014 WL 7366256, at *14 (M.D. La. Dec. 24, 2014) ("viewed in the light most favorable to plaintiff, [her testimony and statements about her asthma] would be sufficient for a reasonable trier of fact to find" substantial limitation); *Mercer v. Arbor E & T, LLC*, 2013 WL 164107, at *13 (S.D. Tex. Jan. 15, 2013) ("even if the Court confined it's [sic] analysis to [plaintiff's] deposition testimony alone, she ... demonstrate[d] a genuine [dispute] of material fact regarding whether [she] is disabled"); *Sechler v. Modular Space Corp.*, 2012 WL 1355586, at *11 (S.D. Tex. Apr. 18, 2012) ("In light of the 'substantially limits' standard created by the [ADA Amendments Act of 2008], the Court thinks it appropriate to read [plaintiff's] testimony as giving rise to a genuine [dispute] of material fact")).
Document Number: 52739

standards, Williams' declaration creates a genuine dispute of material fact for whether her impairments are substantially limiting.[59]

Considering the post-amendment regulations and definitions applicable in this case, and applying the reasoning and analysis set forth by the Fifth Circuit above in *Williams*, the Court finds that whether Plaintiff herein is disabled for purposes of the ADA is a genuinely disputed material fact. Although the Court did exclude the testimony and reports of Dr. Warshowsky, Plaintiff attested in her declaration that her "symptoms include severe, painful rashes that make it difficult to work and to move around freely."[60] Plaintiff further declared that her "symptoms include fatigue, difficulty concentrating, difficulty sleeping, difficulty breathing, upset stomach, lack of focus, and irritability, all of which interfere with my ability to perform my job duties as a teacher."[61] Plaintiff has also submitted numerous medical records detailing her treatment for several of these claimed illnesses/conditions during the relevant time period.[62]

Accordingly, the Court finds that whether Plaintiff is disabled, particularly whether any claimed impairments substantially limited a major life activity, under the ADA is a disputed issue of fact best left for the trier of fact to determine. Both Parties' motions are denied on this issue.

## 2. Qualified for the Position

"The ADA protects qualified individuals with disabilities from discrimination."[63] The Act defines a "Qualified Individual" as:

an individual who, with or without reasonable accommodation, can perform

---

[59] *Id.*
[60] Rec. Doc. No. 108-2, ¶ 6.
[61] *Id.* at ¶ 7.
[62] Rec. Doc. No. 23-4; Rec. Doc. No. 54-2; Rec. Doc. No. 54-6.
[63] *Picard v. St Tammany Parish Hospital*, 423 Fed. Appx. 467, 469 (5th Cir. 2011).
Document Number: 52739

the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.[64]

"The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position the individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of the position."[65]

Defendant maintains that Plaintiff cannot demonstrate an issue of fact as to whether she was "qualified" because, pursuant to Louisiana state law, the Plaintiff was determined to be an ineffective teacher based on poor teaching skills such that she was subject to termination for incompetence under La. R.S. 17:442(C)(1).[66] Further, Defendant maintains that La. R.S. 17:3902(C)(2)(b)(v) provided that, based on this finding of ineffectiveness, the local board was permitted to "timely initiate termination proceedings."[67]

Defendant states that it had both written job criteria and state-mandated performance criteria for Plaintiff's teaching position. Defendant acknowledged that Plaintiff testified in her deposition that she was able to perform all of the enumerated duties of her teaching job, which included: providing daily lesson plans; providing and recording student progress; grading tests; grading assignments; checking daily

---

[64] 42 U.S.C. § 12111(8).
[65] 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m); *Shirley v. Precision Castparts Corp.,* 726 F.3d 675, 678 (5th Cir.2013); *Kennedy v. Parkview Baptist School Inc.,* 2014 WL 7366256 at *6 (M.D. La. Dec. 24, 2014).
[66] "[A] final performance evaluation program as provided in R.S. 17:3881 through 3905 … shall constitute sufficient grounds for disciplinary action …"
[67] Rec. Doc. No. 76-2 at 9.
Document Number: 52739

attendance; providing progress reports to parents; assigning classroom and homework; checking student folders; escorting students to and from the cafeteria and other activities; meeting with administration, colleagues, students, and parents; using both audio and visual materials to teach class; attending faculty meetings; and participating in parish-wide in-service days.[68]   Defendant did not present summary judgment evidence to contradict Plaintiff's testimony that she was capable of performing these functions of her job, nor did it argue that she failed to perform these functions.  Defendant singularly relies on the Plaintiff's "ineffective" rating to argue that she was not qualified for her job because state law mandates that teachers maintain an effective performance rating relative to student progress using the established protocols.

Plaintiff counters that her "ineffective" rating is irrelevant to whether she was "qualified" for her job within the meaning of the ADA, arguing that "state law does not determine whether an individual is 'qualified' within the meaning of the ADA, a federal statute," and applicable regulations provide that "essential functions are determined by considering job descriptions, not by reference to 'state law.'"[69]  Plaintiff maintains there is no evidence to support Defendant's assertion that achieving an "effective" rating was an essential function of her job.  Nevertheless, should the Court find that an effective rating was an essential job function, Plaintiff contends she has presented sufficient evidence to demonstrate that there is an issue of fact whether reasonable accommodations could have allowed Plaintiff to achieve this function.

The Court disagrees with Plaintiff's assertion that state mandated performance

---

[68] Rec. Doc. No. 77-8, Deposition of Katina Hebert, pp. 166-168.
[69] Rec. Doc. No. 108 at 11.
Document Number: 52739

standards for teachers are irrelevant when considering the essential functions of her job as a school teacher. Indeed, Plaintiff does not offer any evidence or law suggesting that Defendant is not bound to apply these performance standards to its teachers, and, contrary to Plaintiff's argument, Defendant **did** cite the law implementing these standards.[70] However, there is an issue of fact regarding Defendant's efforts to provide reasonable accommodations to Plaintiff, as will be detailed below, particularly in light of Defendant's acknowledgment that, at no time, did Plaintiff's principal or direct supervisors believe that she was disabled under the ADA.[71] Thus, although the Court finds that being deemed "effective" under state mandated performance standards is an essential function of the job of a school teacher in Louisiana, as set forth by Louisiana law, Plaintiff has demonstrated a question of fact as to whether there were any reasonable accommodations that could have allowed her to perform the essential functions of her job, *i.e.*, in this instance, improved her performance rating.

Plaintiff states in her sworn Declaration that she was never deemed ineffective when she was teaching in schools located further away from chemical plants.[72] Plaintiff has also submitted evidence demonstrating that she has received positive performance evaluations while she has been employed by the East Baton Rouge Parish School System, where she has been employed since her termination by Defendant.[73] Indeed, Plaintiff's Evaluation Report, dated May 24, 2017, following the 2016-2017 session as a

---

[70] (Emphasis added). The Court acknowledges Plaintiff's argument that these performance standards have not been applied equally to Defendant's teachers.
[71] *See* Rec. Doc. No. 77-2, Affidavit of Robin Anderson (Principal of Sorrento Primary School during the dates in question), ¶ 2.
[72] Rec. Doc. No. 108-2, ¶ 44.
[73] *Id.,* ¶ 45; Rec. Doc. No. 108-3.
Document Number: 52739

teacher at LaBelle Aire Elementary School in East Baton Rouge Parish, shows that Plaintiff's overall rating was "Highly Effective," and Plaintiff received accolades from her evaluator.[74]  Further, Plaintiff's Declaration contains the allegations that Defendant failed to follow its own policies in evaluating, counseling, and attempting to correct her alleged deficiencies, and Defendant treated Plaintiff differently than other similarly situated teachers.[75]  Accordingly, whether Plaintiff could perform the essential functions of her job, with or without reasonable accommodations, is a question of fact for which there exists conflicting evidence that the Court cannot determine on summary judgment.

### 3.    Reasonable Accommodation

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability [...] unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."[76]  To sustain a failure to accommodate claim, a plaintiff must show that: "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations."[77]

An employee in need of an accommodation has the responsibility of informing her employer of this need.  Further, where the disability, resulting limitations, and necessary reasonable accommodations are not open, obvious, and apparent to the employer, the

---

[74] Rec. Doc. No. 108-3 at 1.
[75] Rec. Doc. No. 108-2, ¶¶ 38–43.
[76] 42 U.S.C. § 12112(b)(5)(A).
[77] *Feist v. Louisiana Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)(internal quotation marks omitted).
Document Number: 52739

initial burden rests "primarily upon the employee [...] to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations."[78] The employee's request for accommodations "must explain that the adjustment in working conditions or duties she is seeking is for a medical condition-related reason, but the **employee need not mention the ADA or use the phrase 'reasonable accommodation**.'"[79]

When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in "flexible, interactive discussions to determine the appropriate accommodation."[80] EEOC regulations provide that an employer should initiate the interactive process, but the interactive process requires the input of the employee as well as the employer.[81]

Defendant moves for summary judgment on this claim, arguing that it "was never informed by [Plaintiff] that she had a disability defined by the ADA, i.e. an 'impairment' that significantly restricted the performance of a major life activity as compared to the average person."[82] Defendant also maintains that it never considered Plaintiff disabled in any sense as no disability or impairment was obvious or apparent,[83] she never missed a day of work or left early due to any medical condition or impairment during the year of her termination (2014-2015);[84] she never experienced any health-related attacks or

---

[78] *Griffin v. United Parcel Service, Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) (citing *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009)).
[79] *Chevron Phillips*, 570 F.3d at 621 (emphasis added).
[80] *Griffin*, 661 F.3d at 224.
[81] *Loulsgeld v. Akzo Nobel Inc.*, 178 F.3d 731, 735 (5th Cir. 1999) (citing 29 C.F.R. § 1630.2(o)(3)).
[82] Rec. Doc. No. 76-2 at 12.
[83] Rec. Doc. No. 77-2 (Affidavit of Robin Anderson); Rec. Doc. No. 76-4 (Excerpt from Deposition of HR Director Randy Watts).
[84] Rec. Doc. No. 78-1.
Document Number: 52739

emergencies requiring immediate attention; and she never provided any medical records to Defendant prior to the initiation of her termination.[85]   Defendant acknowledges that Plaintiff submitted letters from health care providers in 2011 and 2012 regarding Plaintiff's symptoms related to allergies, skin conditions, and headaches, which Defendant states "are conditions not uncommon among teachers, staff, and students in a primary school."[86] Defendant also argues that "[i]t is important to note that Hebert has not disclosed a single document or witness that deemed her to be 'disabled' and/or having an 'impairment' within the meaning of the ADA prior to or at the time of her termination."[87]

Defendant acknowledges medically-related requests Plaintiff submitted to her superiors prior to her termination but refers to these as "requests for special treatment" related to her allergy, headache, and/or asthma symptoms.[88]   Defendant argues these were "primarily submitted by way of generic 'to whom it may concern' letter[s] solicited from a health care provider and based upon plaintiff's subjective complaints."[89] Defendant cites to four such letters, dated 9/21/11, 10/6/11, 9/18/13, and 11/25/13, as identified in Plaintiff's original *Complaint*.[90]

Notwithstanding its claims that it was never advised of any disability/impairment, nor did it consider Plaintiff disabled or impaired under the ADA, Defendant contends it worked "back and forth" with Plaintiff to accommodate all reasonable requests.[91] Defendant cites the deposition testimony of Ascension Parish School System Human

---

[85] Rec. Doc. No. 77-8 (Deposition of Katina Hebert, pp. 148-150).
[86] Rec. Doc. No. 76-2 at 12.
[87] *Id.* (emphasis omitted).
[88] *Id.* at 14.
[89] *Id.*
[90] Rec. Doc. No. 1, ¶11.
[91] Rec. Doc. No. 76-2 at 14 (quoting Rec. Doc. No. 76-4, Deposition of Randy Watts, p. 19, line 15).
Document Number: 52739

Resources Director Randy Watts ("Watts"), wherein Watts testified that Plaintiff had made requests for accommodations on different occasions, and he acknowledged that, although he did not recall ever meeting with Plaintiff to discuss potential accommodations, he "went back and forth" with her via email communications discussing potential accommodation options.[92]   Further, Defendant contends it did, in fact, provide Plaintiff with reasonable accommodations when it could do so, noting that Fifth Circuit jurisprudence provides that an employee has a right to a reasonable accommodation, but not the employee's "preferred accommodation."[93]   Sorrento Primary School principal Robin Anderson ("Anderson") attested as follows in response to accommodation requests made by Plaintiff:[94]

> 5.  In response to 4 requests by Katina Hebert through letters from health care providers in 2011 and 2013, indicating that Hebert complained of symptoms being aggravated or caused by certain odors, Affiant implemented the following non-exclusive special procedures relative to the school's use of special cleaning products and schedules with the custodial staff related to cleaning Katina Hebert's classroom and other work areas in order to avoid her exposure to "strong odors" and/or pesticides:  she was permitted to use her inhaler or other medication; she was allowed use of an air purifier in her classroom; she was allowed to open her outside door; and, if needed, to wear a mask or other device when in common areas or outdoors to avoid exposure to allergens or offending odors.

Watts confirmed that certain accommodations were made related to Plaintiff's complaints but also confirmed that Plaintiff's requests to be transferred to other schools were denied.[95]   In any event, Defendant maintains that the summary judgment evidence demonstrates that it engaged in the interactive process with Plaintiff and attempted to

---

[92] *Id.* at 19-20.
[93] Rec. Doc. No. 76-2 at 16 (citing *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 457 (6th Cir.2004); 29 C.F.R. pt. 1630, App., § 1630.9; *see also, E.E.O.C. v. Agro Distribution LLC*, 555 F.3d 462 (5th Cir. 2009)).
[94] Rec. Doc. No. 77-2 (Affidavit of Robin Anderson, ¶ 5).
[95] Rec. Doc. No. 76-4 (Deposition of Randy Watts, pp. 20-25).
Document Number: 52739

accommodate all reasonable requests in relation to the medical conditions of which she complained; thus, it is entitled to summary judgment on her failure to accommodate claim.

Plaintiff contends that Defendant agreed to provide "certain limited accommodations, all of which were either ineffective or not actually provided."[96] Plaintiff cites her sworn Declaration wherein she declared that, although she was advised "that APSB would not buff or wax the floors during my work hours[,] APSB continued to buff and wax the floors during work hours on a regular basis."[97] Plaintiff also declared that, "[a]lthough APSB ostensibly prohibited the spraying of chemicals in certain areas of the school to prevent me from being exposed to such chemicals, these rules were never enforced, and APSB frequently sprayed such chemicals in these areas."[98] Plaintiff declared that her request that the school write a letter to parents asking that they not permit students to wear perfumes/colognes to school was denied at Sorrento although it had been granted when she was teaching at St. Amant.[99] Additionally, Plaintiff declared that, when she complained that certain accommodations were ineffective in ameliorating her symptoms, she was "ridiculed."[100] Plaintiff claims she sought a meeting with Watts to discuss her requests, but he never responded or agreed to meet with Plaintiff.[101]

Plaintiff maintains that Anderson "demonstrated considerable animosity" towards Plaintiff when she discussed her conditions, requests for accommodations, and requests to transfer, and Anderson allegedly frequently screamed at Plaintiff where other

---

[96] Rec. Doc. No. 108 at 3.
[97] Rec. Doc. No. 108-2, ¶ 16.
[98] *Id.* at ¶ 17.
[99] *Id.* at ¶ 18.
[100] *Id.* at ¶ 21.
[101] *Id.* at ¶ 22.
Document Number: 52739

employees could hear and often remarked that she didn't believe that Plaintiff's allergies were "that bad."[102]  Plaintiff claims she first advised Anderson of her conditions at Sorrento Primary on March 11, 2011.[103]  On September 21, 2011, Plaintiff's treating physician, Dr. Vimla Menon ("Dr. Menon"), sent a letter to Human Resources recommending Plaintiff be transferred back to St. Amant as an accommodation for her rhinitis, asthma, and related symptoms, based on the conclusion that Plaintiff's symptoms were less severe when she had previously been employed at St. Amant.[104]  Plaintiff received a denial of this request from Watts dated September 27, 2011, wherein Watts stated Plaintiff would provide the alternative accommodation of not cleaning her classroom until after hours, but the letter did not provide a reason for the transfer denial or explain how a transfer was unavailable or would cause an undue burden to Defendant.[105]

Plaintiff contends that, shortly after this request and denial, on October 2, 2011, she emailed Anderson to advise of her worsening symptoms due to the use of classroom cleaning products.  Plaintiff contends that she was informed "shortly thereafter" that she would be subjected to a "surprise in-class observation" that same day. While Plaintiff acknowledged Defendant's right to conduct unannounced observations, Plaintiff maintains teachers were normally given advance notice of such observations, and further, that these observations did not usually include the presence of a school board member.[106]

Plaintiff claims that she formally requested transfers from Sorrento on several occasions, to no avail:  Plaintiff requested another transfer by letter citing "personal and

---

[102] Rec. Doc. No. 108 at 3 (citing Rec. Doc. No. 108-2, ¶ 36).
[103] Rec. Doc. No. 108-2, ¶ 13.
[104] *Id.* at ¶ 14.
[105] *Id.* at ¶ 15.
[106] *Id.* at ¶ 37.
Document Number: 52739

medical reasons" on April 12, 2012;[107] on April 30, 2013, she again requested a transfer citing "personal medical and environmental concerns;[108] on September 18, 2013, Dr. Menon wrote a letter on Plaintiff's behalf, which she submitted to Defendant, recommending "the avoidance of fumes, irritants, odors, chemicals, pollutants and cigarette smoke";[109] on November 25, 2013, Dr. Charles Eberly wrote a letter regarding the increase in Plaintiff's migraine headaches and symptoms of asthma and dermatitis and requested "[p]lease take this into considering when chosing [sic] her work location";[110] on April 24, 2014, Plaintiff against formally requested a transfer citing "personal, medical and environmental concerns";[111] on July 14, 2014, Dr. Alan Dattner wrote a letter recommending Plaintiff be transferred to a school further away from chemical plants, citing her "rash and multiple environmental sensitivities," and noting that Plaintiff's symptoms had worsened based on her proximity to chemical plants;[112] Plaintiff again formally requested a transfer on April 29, 2015 citing "personal, medical and environmental concerns";[113] on June 1, 2015, Dr. Karen Miller wrote a letter requesting Plaintiff be transferred to another school to accommodate her "inflammatory conditions that worsen when exposed to chemical emissions from chemical plants, manufacturing and industrial facilities";[114] on July 22, 2015, Dr. Menon, Dr. Warshowsky, and Dr. Jeffery Frederic all wrote letters on Plaintiff's behalf describing her symptoms and diagnoses in

---

[107] *Id.* at ¶ 23.
[108] *Id.* at ¶ 24 (quoting Rec. Doc. No. 73-3 at 2).
[109] *Id.* at ¶ 25 (quoting Rec. Doc. No. 23-4).
[110] *Id.* at ¶ 26 (quoting Rec. Doc. No. 23-5).
[111] *Id.* at ¶ 27 (quoting Rec. Doc. No. 73-3 at 3).
[112] *Id.* at ¶ 28 (quoting Rec. Doc. No. 73-3 at 4).
[113] *Id.* at ¶ 29 (quoting Rec. Doc. No. 73-3 at 5).
[114] *Id.* at ¶ 30 (quoting Rec. Doc. No. 23-6).
Document Number: 52739

support of her requests for transfer.[115]

Despite these multiple requests, Plaintiff claims that the Defendant actually responded to her requests only twice.[116]  Watts denied Plaintiff's transfer requests by letter on September 27, 2011 and June 1, 2015, and Plaintiff contends that neither letter stated that such transfer was unavailable or unduly burdensome for Defendant.[117]

The Court finds that there are genuine issues of fact as to whether Defendant engaged in the interactive process in good faith and failed to provide Plaintiff with reasonable accommodations.  Although not binding on the Court, the analysis set forth by the Third Circuit *Taylor v. Phoenixville School Dist.*[118] is particularly helpful:

> An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer [...] [B]oth parties bear responsibility for determining what accommodation is necessary. [...] [N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.[119]

The Court finds that there is a genuine issue for trial as to whether, if both qualified and disabled, Plaintiff received a reasonable accommodation and, if she did not receive such accommodation, a genuine issue of fact as to whose actions led to a breakdown in the interactive process.  Defendant maintains that it didn't believe Plaintiff demonstrated

---

[115] *Id.* at ¶ 32 (quoting Rec. Doc. No. 73-3 at 6-8).

[116] *Id.* at ¶ 33.

[117] *Id.* at ¶¶ 33-34.

[118] 184 F.3d 296 (3d Cir. 1999).

[119] *Id.* at 312 (quoting *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996)); *see also Griffin*, 661 F.3d at 224 (employer cannot be held liable under ADA where breakdown of interactive process is attributable to employee, not employer).

Document Number: 52739

that she was disabled under the ADA; however, the law is clear that Plaintiff was not required to use legalese or "magic words" in seeking relief under the ADA. The Court acknowledges that Defendant claims it did not receive several of these requests until after the initiation of Plaintiff's termination; however, Plaintiff has presented dated documents that correspond with her claims. It is for the trier of fact to determine whether Defendant was in receipt of the letters and, if so, when.

Further, the Court acknowledges that, simply because Plaintiff repeatedly requested a transfer does not mean that she was entitled to a transfer under the ADA. As noted by Defendant, a disabled employee is not entitled to the employee's preferred accommodations, only reasonable ones. Nevertheless, Defendant has not presented summary judgment evidence demonstrating that Plaintiff's transfers were denied in accordance with the regulations governing this process. Plaintiff has presented sufficient summary judgment evidence demonstrating questions of fact as to Defendant's good faith in engaging in the interactive process and Defendant's justifications for the denial of certain requested accommodations. As there is little evidence before the Court that Defendant meaningfully considered or discussed with Plaintiff her transfer requests, the Court concludes that summary judgment is inappropriate on this claim.

4.    Adverse Employment Action on Account of Disability

It is undisputed that Plaintiff was subjected to an adverse employment action; however, the Parties dispute whether her termination was "on account of her disability" or due to her ineffective performance rating. In the Court's view, Defendant has presented a legitimate, nondiscriminatory reason for Plaintiff's termination as evidenced by her alleged poor performance evaluations and resulting "ineffective" rating. Thus, the burden

shifts back to Plaintiff to demonstrate some pretextual discriminatory animus for this decision.

In a discriminatory termination case brought under the ADA, the Fifth Circuit has explained that, once an employer has demonstrated a legitimate, nondiscriminatory reason for the plaintiff's termination, a plaintiff must "offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative)."[120] At the summary judgment stage, "'[e]vidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive.'"[121] Further, in the Fifth Circuit, a plaintiff's "failure to demonstrate pretext does not end the inquiry. Under the ADA, 'discrimination need not be the sole reason for the adverse employment decision ... [so long as it] actually play[s] a role in the employer's decision making process and ha[s] a determinative influence on the outcome.'"[122] Thus, "an employee who fails to demonstrate pretext can still survive summary judgment by showing that an employment decision was 'based on a mixture of legitimate and illegitimate motives ... [and that] the illegitimate motive was a motivating factor in the

---

[120] *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 702 (5th Cir. 2014)(quoting *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (citations and internal quotation marks omitted); *see also Evans v. Tex. Dep't of Transp.*, 547 F.Supp.2d 626, 640 (E.D.Tex.2007) (applying same analysis to cases under ADA), *aff'd*, 273 Fed.Appx. 391 (5th Cir. 2008) (per curiam)).
[121] *Id.* (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)).
[122] *Id.* (quoting *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008) (citation and internal quotation marks omitted)).

Document Number: 52739

decision.'"[123]

Although Defendant has submitted ample evidence to support its legitimate, nondiscriminatory reasons for terminating Plaintiff, Plaintiff has presented summary judgment evidence that could support the inference that her claimed disabilities and requests for accommodations were at least motivating factors in her termination. And at the summary judgment stage, the evidence and all inferences must be viewed in the light most favorable to the non-movant.[124]

First, Plaintiff presents evidence that she was ridiculed and mocked for her claimed medical conditions and symptoms. Second, Plaintiff has presented evidence to suggest that Defendant strayed from its standard policies and procedures in evaluating and scoring her for purposes of the state mandated performance ratings.

As set forth above, Plaintiff claims that Anderson often "screamed" at her in front of other employees and told Plaintiff she did not believe her allergies were "that bad."[125] Further, Plaintiff claims that the surprise same-day observation of her classroom on October 4, 2011, subsequent to her complaints early in the day about her purported accommodations not being followed, is evidence of pretext.

As to Defendant's decision to terminate Plaintiff based on the ultimate rating of Plaintiff as "ineffective," Plaintiff presents evidence from which an inference could be drawn that Defendant either strayed from its standard policies and procedures when it came to evaluating Plaintiff, and/or Defendant failed to apply performance evaluations

---

[123] *Id.* (quoting *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005) (internal quotations omitted)).
[124] *Germain v. US Bank National Ass'n as Trustee for Morgan Stanley Mortgage Loan Trust 2006-7*, 920 F.3d 269, 272 (5th Cir. 2019)(citing *FDIC v. Dawson*, 4 F.3d 1303, 1306 (5th Cir. 1993)).
[125] *Supra* note 263.
Document Number: 52739

and standards equally to its teachers.  It is well-settled in the Fifth Circuit that relevant evidence for establishing a *prima facie* … case "may include ... an employer's departure from typical policies and procedures."[126]

Plaintiff contends Defendant departed from state and school policy and procedures regarding Student Learning Targets (SLTs).  Plaintiff claims that Defendant failed to work collaboratively with her, as is required by state law and school policy, in setting her students' SLTs.[127]  Plaintiff claims that Anderson and other administrators at Sorrento provided her with a chart instructing her how to write her SLTs and, in one instance, Rhonda Gillard, Sorrento Assistant Principal, physically wrote Plaintiff's SLTs.[128]  Plaintiff also claims that another teacher at Sorrento disclosed to Plaintiff her SLTs for her class which Plaintiff contends had lower, more attainable requirements.[129]  Plaintiff further contends other teachers were permitted to change their SLTs after they had been written or to exclude poor performing students to determine whether the teacher's SLTs had been met.[130]  Plaintiff claims that, on at least one occasion, her SLTs were altered after they were entered into the system.[131]  Plaintiff also contends that she requested training on the scoring rubric so that she could improve her scores, but she was never given this training that was provided to other teachers.[132]

Next, Plaintiff claims Defendant departed from its standard procedures in implementing "mock observations."  Amy Dunn, Elementary Instructional Supervisor for

---

[126] *Feist v. La. Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454-55 (5th Cir. 2013).
[127] Rec. Doc. No. 54-7 at 8, 18, 23, & 65.
[128] Rec. Doc. No. 108-2, ¶ 39.
[129] *Id.* at ¶ 40.
[130] *Id.* at ¶ 41.
[131] *Id.* at ¶ 42.
[132] *Id.* at ¶ 43.

Document Number: 52739

the school system, testified that a "mock observation" is to provide supportive feedback to a teacher and would not be included in a teacher's final evaluation scores.[133] Yet, although Anderson advised Plaintiff she would not receive scores for her mock observations, papers submitted in connection with Plaintiff's administrative hearing in support of her termination included evidence of Plaintiff's scores on a mock observation.[134] Notably, however, this documentation states that the mock observation performed on 2/16/13 was "not calculated toward final evaluation but <u>only to assist her</u>."[135] Plaintiff also challenges the inclusion of evidence of her performance evaluations during the 2013-2014 school year at this hearing to be unfair as she missed most of that school year due to medical leave.[136]

Plaintiff also maintains that Defendant departed from its standard policies and procedures in the following ways:

> On June 5, 2013, I filed a grievance with APSB alleging that Sorrento deviated from written policies in the implementation of my Intensive Assistance (IA) plan in the following manners:
>
> a. I did not receive a pre-observation conference prior to one of my observations, in violation of § 105(B)(3) of Title 28 of Bulletin 130 (Regulations for the Evaluation and Assessment of School Personnel)
> b. I was not allowed to provide my input in the development of the plan, in violation of § 315(E), which requires the plan to be "developed collaboratively by the evaluator and the evaluatee";
> c. The assistance and support required by the plan was not actually provided by APSB;
> d. I was not given any "follow-up comments" after my video observation, in violation of § 315(E)(5), which requires such comments;
> e. I was not given required feedback after my observations, in violation of § 315(E)(7);
> f. I was not given copies of tests and other materials pertaining to my IA

---

[133] Rec. Doc. No. 60-7, Deposition of Amy Dunn, p. 33.
[134] Rec. Doc. No. 60-5 at 10.
[135] *Id.*
[136] *Id.* at 6; 8-9.
Document Number: 52739

plan as required by § 315(E)(7); and

g.    My IA plan did not state the action that would be taken if I did not approve, as required by § 315(E)(8).[137]

Plaintiff contends the above violations, and the Sorrento administration's contempt for her, are demonstrated through email communications among several Sorrento administrators and staff wherein they appear to mock Plaintiff's requests for assistance in increasing her rating. The following statements appear in Plaintiff's summary judgment evidence:[138]

1. "LOL!" in reference to Mrs. Anderson forgetting to meet with Mrs. Hebert as required under the plan (Rhonda Gillard, April 2, 2015);[139]

2. "Ugh!!! How should I respond?" in reference to an email from Mrs. Hebert asking to observe another teacher in order to develop her skills (Robin Anderson, May 1, 2015);[140]

3. "She came in this morning. I hadn't even responded back to her yet! LOL!" in reference to the requested observation described above (Mandy Gomez, March 5, 2015);[141]

4. ":)" in response to the email thread referencing that same observation (Lindsay Enriquez, March 5, 2015);[142]

5. "Geez LouiseL" (sic) in reference to Mrs. Hebert asking to discuss some notes with Lindsay Enriquez that Mrs. Hebert took while observing Ms. Enriquez'[s] class (Robin Anderson, February 26, 2015);

6. "I am reading this thread and am literally laughing out loud! All I can think of is the play 'Who's on First?' That is what is sounds like!!! LAWD HELP US JESUS!!!!!!" in reference to Mrs. Hebert seeking assistance (Robin Anderson, April 24, 2015);[143]

7. "Not sure if support is what she needs at this time. J" (sic) (Rhonda

[137] Rec. Doc. No. 108-2, ¶ 46.
[138] Rec. Doc. No. 108 at 27.
[139] Rec. Doc. No. 108-4 at 13.
[140] *Id.* at 2.
[141] *Id.* at 4.
[142] *Id.* at 5.
[143] *Id.* at 6.
Document Number: 52739

Gillard, April 24, 2015);[144] and

8. Statements by Robin Anderson and Rhonda Gillard strongly implying that they informed Lindsay Enriquez that Mrs. Hebert was on an IA plan, in violation of school policy that such plans were confidential, and joking about same.[145]

Based on the summary judgment evidence presented by Plaintiff, and the requirement that the Court view all evidence at this stage in Plaintiff's favor on Defendant's motion, the Court finds that Plaintiff has demonstrated genuine issues of material fact as to whether Defendant's legitimate, nondiscriminatory reason for her termination was pretextual or whether her disability played a motivating factor in her termination. Summary judgment is denied on Plaintiff's discriminatory discharge claim.

## C. Retaliation under the ADA

Plaintiff has also asserted a claim of retaliatory discharge under the ADA. In order to establish a *prima facie* case of retaliation under the ADA, Plaintiff "must show that (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action."[146] "'If the employee establishes a *prima facie* case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation.'"[147] An

---

[144] *Id.* at 9.
[145] *Id.* at 10.
[146] *Feist v. La. Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013)(citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007)(Title VII); *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999)(ADA)).
[147] *Id.* (quoting *LeMaire v. Louisiana*, 480 F.3d 383, 388-89 (5th Cir. 2007)(internal citation omitted))(emphasis added).
Document Number: 52739

employee can accomplish this "by showing that the adverse action would not have occurred 'but for' the employer's retaliatory motive."[148]   To survive summary judgment, "the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity."[149]

Defendant's argument and evidence in support of its retaliatory discharge claim is essentially the same as that presented for Plaintiff's discriminatory termination claim. Defendant maintains that Plaintiff is not a qualified individual with a disability as defined by the ADA and further insists that it has presented legitimate, nondiscriminatory reasons, supported by record evidence, that Plaintiff was terminated solely because of her poor performance rating.   Defendant argues there is no evidence to dispute that Anderson contacted Defendant in May 2015 to advise that Plaintiff was ineffective and to recommend her termination, which is prior to Plaintiff's email dated June 24, 2015, appealing the denial of her transfer request and the filing of an EEOC complaint. Defendant posits:  "Clearly, the email with the threatened EEOC complaint could not be the alleged pretextual reason for the adverse employment action if it post-dates the time when termination proceedings were initiated."[150]

As set forth above, the Plaintiff was not required to use special language or demonstrate with medical evidence that she was disabled under the ADA to receive accommodations under the ADA.  The Court has already held that Plaintiff's requests for accommodations and transfers, coupled with the description of her medical conditions

---

[148] *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S.338, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013)(Title VII); *Seaman*, 179 F.3d at 301 (ADA)).

[149] *Id.* (quoting *Long v. Eastfield College*, 88 F.3d 300, 308 (5th Cir. 1996)(internal quotation marks omitted)).

[150] Rec. Doc. No. 76-2 at 13 (citing Exhibits 2, 7, 6).

Document Number: 52739

which were often accompanied by letters from treating physicians, were sufficient to place Defendant on notice that it should engage in the interactive process with Plaintiff. These requests also constitute protected activity under the ADA such that Plaintiff's June 24, 2015 letter is not the only triggering event/date for purposes of evaluating her retaliation claim. Thus, the Court finds that Plaintiff has presented a *prima facie* case of retaliation, and that the Defendant has offered evidence of a legitimate, nondiscriminatory reason for Plaintiff's termination; however, for the reasons discussed at length above, the Court finds that there is a question of fact as to whether or not this reason was legitimate and/or the "but for" cause of Plaintiff's accommodation denials and ultimate termination.

### D. Statutory Immunity

Defendant argues alternatively that it is immune from suit under the ADA pursuant to the statutory immunity provided to state officials under La. R.S. 9:2798.1. Defendant contends that, as it is a political subdivision of the State of Louisiana, it was acting within its policymaking or discretionary authority when it terminated Plaintiff in accordance with state law. The Court located no case where this statute was applied as a defense to suit under the ADA, a federal statute. Further, in *Frank v. Parnell*, the district court for the Western District of Louisiana made clear that: "Louisiana applies qualified immunity principles to **state constitutional law claims** based on '[t]he same factors that compelled the United States Supreme Court to recognize a qualified good faith immunity for state officers under § 1983.'"[151] That same court held previously that "discretionary acts immunity **only applies to state law claims**. It does not preclude liability under Section

---

[151] No. 18-CV-00978, 2019 WL 2438685 at *8 (W.D. La. May 14, 2019)(quoting *Mallery v. Theriot*, 2013 WL 2286667, at *2 (W.D. La. May 23, 2013) (citing *Roberts v. City of Shreveport*, 397 F.3d 287, 296 (5th Cir. 2005)))(internal quotation marks omitted)(emphasis added).
Document Number: 52739

1983."[152]  Plaintiff herein has not asserted any state law claims against Defendant, and the Court finds La. R.S. 9:2798.1 inapplicable.  Accordingly, any motion for alternative relief under statutory immunity is DENIED.

## IV.    CONCLUSION

For the reasons set forth above, the *Motion for Partial Summary Judgment*[153] by Plaintiff and the Defendant's *Motion for Summary Judgment*[154] are DENIED.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 20th day of August, 2019.

_____

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[152] *Mills v. City of Shreveport*, 58 F.Supp.3d 677, 683 (W.D. La. 2014)(*Pea v. City of Ponchatoula*, No. 13–542, 2014 WL 1050783 at *4 (E.D.La. Mar. 17, 2014))(emphasis added).
[153] Rec. Doc. No. 72.
[154] Rec.Doc. No. 76.
Document Number: 52739